BC

FILED
9/21/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

ALR

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| Alfred Holt and Marilia Coutinho Espinola, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 1:25-cv-10936 |
| | ) | |
| vs. | ) | Judge LaShonda A. Hunt |
| | ) | |
| | ) | Magistrate Judge Keri L. Holleb |
| BH Management Services, LLC, | ) | Hotaling |
| Amzak Waukegan, LLC, and | ) | |
| Katrina Blair | ) | Jury Trial Demanded |
| | ) | |
| | ) | |
| Defendants. | | |

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

**NATURE OF THE ACTION**

1. This is a civil-rights retaliation action under the Fair Housing Act, 42 U.S.C. § 3617. It concerns the housing actions that followed after Plaintiffs Alfred Holt and Marilia Coutinho Espinola complained to property management that the Property's towing practices involved racist and discriminatory targeting. Holt also expressly challenged management's responsibility for continuing to use the towing vendor after management knew of the racism concern.

2. On August 31, 2026, the Court dismissed Plaintiffs' First Amended Complaint without prejudice and granted leave to amend. This Second Amended Complaint is filed pursuant to that leave, supersedes the prior complaints, narrows the case to the Fair Housing Act retaliation claim supported by the presently available facts, and

pleads specific facts concerning protected activity, knowledge, adverse action, and causal connection.

3. Plaintiffs do not contend that they must prove at the pleading stage that the September 2024 tow itself ultimately violated the Fair Housing Act. The protected activity alleged here includes Holt's explicit, recorded good-faith report of racial discrimination to Property Manager Katrina Blair and Espinola's separate complaint to property management that the vehicle had been wrongfully towed because of racial targeting. Holt's concern about racial discrimination was based in part on information Blair herself had previously given him concerning racist conduct by the towing company's owner.

**I. JURISDICTION AND VENUE**

4. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343 because Plaintiffs assert a claim under 42 U.S.C. § 3617. A private civil action is authorized by 42 U.S.C. § 3613.

5. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Waukegan, Illinois, within the Northern District of Illinois.

**II. PARTIES AND RELEVANT ACTORS**

6. Plaintiff Alfred Holt ("Holt") is Black and was a tenant and resident of 805 Baldwin Avenue, Apartment 303, Waukegan, Illinois (the "Property") during the events described below.

7. Plaintiff Marilia Coutinho Espinola ("Espinola") was Holt's co-tenant at the Property. In connection with the September 2024 towing dispute, Espinola also

spoke with property management regarding what she and Holt believed was wrongful towing caused by racial targeting. The resident account, charges, termination notice, and threatened loss of possession described below affected their shared tenancy.

8. Defendant AMZAK Waukegan, LLC ("AMZAK") owned the Property and was the landlord identified in the October 2024 10-Day Notice of Termination of Tenancy.

9. Defendant BH Management Services, LLC ("BH") managed the Property's day-to-day operations, including resident accounts, on-site management personnel, lease administration, enforcement, and vendor relationships.

10. Defendant Katrina Blair ("Blair") was the Property Manager. Acting in that role, Blair personally received and discussed Holt's September 25, 2024 race-discrimination complaint, was notified of the RentCafe access problem, and participated in management's handling of the October 22, 2024 10-Day Notice. During the later state-court eviction proceeding in Lake County Case No. 2025EV00001817, Plaintiffs were present when Blair testified, in substance, that she was responsible for blocking or removing Plaintiffs' portal access and that she did so before issuance of the October 22, 2024 10-Day Notice that led to Defendants' first eviction attempt. Blair also testified, in substance, that management would not accept payment after it entered the eviction process.

11. LaQuevia Miller ("Miller") was an Assistant Property Manager employed at the Property. Federico Avalos ("Avalos") was maintenance staff. They are identified because they participated in the October 15, 2024 unit inspection. Michelle Palermo

("Palermo") was a management representative with whom Blair later communicated about enforcement of the 10-Day Notice. Miller, Avalos, and Palermo are not named as Defendants in this Second Amended Complaint.

## III. FACTUAL ALLEGATIONS

### A. Tenancy Before the Protected Complaint

12. Plaintiffs lived at the Property beginning in approximately 2019. Before September 2024, Plaintiffs had not received a comparable 10-Day termination notice accusing them of drug-paraphernalia or unauthorized-animal violations.

13. Plaintiffs ordinarily used BH's resident-management system, RentCafe, to access their resident account and manage rent payments and account information.

### B. September 2024 Tow and Explicit Race-Discrimination Complaint

14. On or about September 21, 2024, Plaintiffs' vehicle was towed from the Property by TNT Recovery Services ("TNT"), the Property's towing vendor, and a charge of approximately $370 was placed on Plaintiffs' bank card. Plaintiffs disputed the charge. U.S. Bank later made the $370 provisional credit final. Plaintiffs do not allege that the bank made a separate finding that the tow was fraudulent.

15. At or near the time of the tow, Holt documented another vehicle encroaching into Plaintiffs' parking area that remained after Plaintiffs' vehicle was towed. That photograph formed part of Holt's basis for questioning the towing practices. Plaintiffs do not allege that the photograph, standing alone, proves the race of the other vehicle's owner or conclusively establishes racial discrimination.

16. During the first towing incident, Holt and Blair were both present at the towing yard. Blair was there in connection with the towing of her daughter's vehicle, which

had also been towed. During that encounter, Blair told Holt that the owner of the towing company had called one of his own employees the N-word. That tow-yard conversation was not recorded; Holt alleges Blair's statement based on his personal recollection of the conversation. Before Blair made that disclosure, Holt had no information leading him to believe that TNT or its owner had engaged in racist conduct.

17. On September 25, 2024, Holt spoke directly with Blair in a recorded conversation. Holt told Blair that improperly parked vehicles were not being towed while his vehicle had been towed, and he expressly stated that "it's discrimination" and "we're being targeted." Holt also raised the towing vendor's racism. His complaint was based in part on Blair's earlier tow-yard disclosure concerning the towing-company owner's use of the N-word toward an employee. In connection with the same towing dispute, Espinola also separately spoke with property management and complained that Plaintiffs' vehicle had been wrongfully towed because of racial targeting. In discussing the towing dispute with Blair during this period, Holt also told Blair, in substance, that he intended to take legal action against Blair and the landlord because he believed they were being complacent in allowing a racist towing vendor to terrorize him and Espinola.

18. Blair immediately showed that she understood Holt's complaint implicated management, not merely the towing company. Blair asked Holt, "are you blaming me at this point or are you blaming them?" Holt responded, in substance, that Blair had hired the vendor.

19. Holt then challenged management's continued relationship with the vendor after learning of racist conduct, including the conduct Blair had previously described to him at the towing yard. Holt told Blair, in substance, that continuing the contract after identifying the vendor as racist implicated management's own responsibility. In the recorded September 25 conversation, when Holt reminded Blair that she had identified the towing company as racist, Blair responded, "They are," and explained that she was already under contract with the towing company and needed a towing company until another could be obtained.

20. During the same conversation, Blair said the parking photograph was "kind of proof that there is definitely something weird about that," stated that she had been through or discussed similar issues with the same people, and referred to tenants going to the vendor and having those kinds of conversations. Blair stated that she did not want tenants put in that position.

21. Plaintiffs' complaints therefore did more than challenge a single tow. Holt expressly opposed what he believed in good faith was race-based housing treatment, a belief informed in part by Blair's own prior disclosure about the towing-company owner's racist conduct, and directly challenged management's decision to continue using the vendor after management had become aware of the racism concern. Espinola separately complained to property management that the towing of Plaintiffs' vehicle resulted from racial targeting. Holt's opposition therefore placed Blair on notice not only that he believed racial discrimination was occurring, but also that he intended to hold Blair and the landlord legally accountable because he

believed management was complacent in allowing the allegedly racist vendor to continue harming Plaintiffs.

**C. Management Did Not Formally Investigate the Discrimination Complaint Before the Termination Notice**

22. In verified responses later filed in the related state-court litigation, AMZAK admitted that no formal internal investigation was conducted regarding Holt's verbal complaint before the 10-Day Notice was issued.

23. AMZAK also admitted that it possessed no written documentation showing that Holt's verbal complaint was investigated, reviewed, or responded to before issuance of the 10-Day Notice.

24. Plaintiffs plead those admissions narrowly. They concern the handling of Holt's discrimination complaint. Plaintiffs do not characterize those admissions as an admission that management possessed no photographs or conducted no inquiry concerning the later alleged lease violations.

**D. RentCafe Resident-Account Status Changed Within Days**

25. By September 30, 2024, only days after Holt's September 25 discrimination complaint and during the same period in which Espinola also complained to property management about racial targeting, Plaintiffs' RentCafe account displayed the message: "You are not currently listed as a resident. Please contact your property management company for more information."

26. On September 30, 2024, Espinola emailed Blair to report the resident-account access problem and requested the exact balance due. Blair therefore had actual

notice that the shared resident account was no longer functioning in the ordinary manner shortly after Holt's complaint.

27. The identity of the person responsible for the RentCafe restriction is no longer unknown to Plaintiffs. During the state-court trial in Lake County Case No. 2025EV00001817, Plaintiffs were present when Blair testified under oath, in substance, that she was responsible for blocking or removing Plaintiffs' portal access and that she did so before issuance of the October 22, 2024 10-Day Notice that formed the basis of Defendants' first eviction attempt. Blair further testified, in substance, that management would not accept payment after it entered the eviction process. Plaintiffs allege this testimony directly identifies Blair as the management actor responsible for the portal restriction and, according to Blair's own sworn account, places that adverse action before the October 22 termination notice.

28. BH's ledger reflects that on October 4, 2024, a $140 late charge was posted and that a separate "Flex" payment of $1,688.39 was credited the same day. Plaintiffs acknowledge that record and do not allege that RentCafe was literally the only conceivable way a payment could ever be transmitted.

29. Plaintiffs' narrower allegation is that their ordinary resident-account access had been deliberately disabled or changed to a status stating that they were not listed as residents, and that a late fee was posted during that period. Blair's later state-court testimony, as alleged above, identifies her as responsible for that restriction and places her action before the October 22, 2024 10-Day Notice. Plaintiffs further allege that, once management moved into the eviction process, management refused

to accept payment, which compounded the payment disruption and account consequences.

**E. October 15 Inspection, Immediate Charges, and October 22 Termination Notice**

30. On October 15, 2024, approximately three weeks after Holt's recorded protected complaint and after Espinola had also complained to property management about racial targeting, Miller and Avalos entered Plaintiffs' apartment for an inspection. Plaintiffs allege that they received no advance notice and did not consent to the entry. Holt was inside the apartment and was showering when the entry occurred.

31. BH's own ledger reflects three charges posted on October 15, 2024: a $100 charge described as an unauthorized or unknown pet during the unit inspection, a $300 pet deposit for an unauthorized cat found during the inspection, and $30 in rent for an unauthorized pet, totaling $430 in pet-related charges.

32. On or about October 22, 2024, AMZAK served a 10-Day Notice of Termination of Tenancy. The Notice expressly tied the alleged violations to the October 15 inspection and alleged, among other things, an unauthorized cat and "various drug paraphernalia" related to the alleged use of marijuana and/or tobacco.

33. Plaintiffs deny using marijuana in the apartment and deny maintaining an unauthorized pet in violation of the lease. Plaintiffs dispute management's characterization of what the October 15 inspection established. Plaintiffs do not allege that the inspection never occurred or that management possessed no photographs.

34. AMZAK's verified state-court responses state that the 10-Day Notice was issued within a few weeks after Holt made his verbal complaint to property staff.

35. Those verified responses further state that Blair contacted Palermo regarding enforcement, that Palermo asked whether the Property had photographic evidence of drug paraphernalia and marijuana, that Blair confirmed that management had photographs, and that Blair was instructed to proceed with enforcement of the 10-Day Notice.

36. Thus, Blair was both the Property Manager who personally received Holt's protected race-discrimination complaint and a management participant in the decision-making process that led to enforcement of the termination notice only weeks later.

**F. Continued Use of the Same Towing Vendor and Second Tow After the Protected Complaint**

37. On or about November 22, 2024, after Plaintiffs had complained to property management about racial discrimination, after Holt had challenged management's continued use of TNT, and after Holt had advised Blair that he intended to pursue legal action against Blair and the landlord concerning that conduct, TNT again towed Plaintiffs' vehicle from the Property. On November 23, 2024, Holt contemporaneously emailed Blair and Property management concerning the second tow and documented another vehicle encroaching into Plaintiffs' parking space that had not been towed.

38. Holt recorded his subsequent conversation with TNT's owner concerning the second tow. During that recorded conversation, the owner stated, in substance, that he did not have the paperwork concerning the tow and therefore did not know why Plaintiffs' vehicle had been towed. The owner then attributed responsibility for the

tow to his employees. After Holt told the owner that he was responsible for the conduct of his employees, the owner agreed to release Plaintiffs' vehicle without requiring payment of a towing or release fee. Holt also told TNT that he had already complained about racism and intended to pursue legal action concerning the towing conduct.

39. Holt informed Blair that TNT's owner had said he lacked the paperwork explaining why Plaintiffs' vehicle had been towed and that TNT had released the vehicle without charge after Holt disputed the tow; Blair responded, "great." Plaintiffs do not presently allege that Blair personally ordered or authorized the November tow. Plaintiffs allege the second tow as additional context showing that, after management had actual notice of Plaintiffs' discrimination complaint and Holt's legal challenge to management's continued use of TNT, Plaintiffs remained exposed to the same vendor and experienced another disputed tow that the vendor ultimately resolved without charging them.

**G. Facts Supporting the Causal Connection**

40. Plaintiffs do not rely on temporal proximity alone. The causal allegation rests on the combined facts set out above: Blair herself had previously supplied Holt with specific information concerning racist conduct by the towing-company owner; both Plaintiffs complained to property management about racial targeting; Blair personally knew of Holt's explicit complaint and understood that Holt was criticizing management's own role; Plaintiffs' resident-account status changed within days; Blair was notified of the access problem; Blair later testified under oath in the state-court eviction proceeding, in substance, that she herself was responsible

for blocking or removing the portal access and that she did so before issuance of the October 22, 2024 10-Day Notice that led to the first eviction attempt; management thereafter refused to accept payment after it entered the eviction process; the October 15 inspection and immediate charges followed; the October 22 Notice expressly relied on that inspection; and Blair participated in the evidence-confirmation and enforcement process for that Notice. Blair also knew that Holt had expressly told her he intended to take legal action against her and the landlord because he believed management was complacent in allowing the allegedly racist towing vendor to continue harming him and Espinola. After those events, the same vendor towed Plaintiffs' vehicle again, and Blair was informed that TNT's owner had said he lacked the paperwork explaining the reason for the tow and that TNT released the vehicle without charge after Holt disputed it.

41. Blair's agreement that the towing vendor had a racism problem does not eliminate the alleged retaliatory motive. The recorded conversation shows why the complaint could create friction with management: Blair specifically asked whether Holt was blaming her, and Holt responded by pointing to management's decision to hire and continue using the vendor. The protected complaint therefore accused management itself of responsibility, not merely a third-party vendor. Holt also expressly told Blair that he intended to take legal action against Blair and the landlord because he believed they were complacent in allowing the allegedly racist vendor to continue harming Plaintiffs. That statement made clear that Holt's complaint directly challenged management's own responsibility and exposed management personnel and the landlord to potential legal consequences.

42. The lack of a formal investigation or written response to Holt's discrimination complaint, when considered together with the rapid sequence of adverse tenancy actions that followed, supports Plaintiffs' allegation that the complaint was followed by an enforcement response rather than a meaningful response to the discrimination concern.

43. For any other internal BH action whose responsible employee or system user is not presently known to Plaintiffs, Plaintiffs say so expressly rather than attributing the act indiscriminately to every Defendant. Plaintiffs expect BH's system records and discovery to identify any additional responsible internal actor or actors.

**H. First State-Court Eviction Proceeding and Voluntary Dismissal**

44. The first state-court eviction proceeding arising from the October 22, 2024 10-Day Notice was filed in the Circuit Court of Lake County as Case No. 2024EV00001836. That proceeding remained pending for months and was voluntarily dismissed without prejudice on July 23, 2025. Plaintiffs rely on the existence, chronology, and disposition of that proceeding as part of the sequence of housing actions that followed their protected complaints. Plaintiffs do not allege that the voluntary dismissal, standing alone, proves that the underlying eviction allegations were false or that the proceeding was retaliatory.

**I. Defendant-Specific Conduct**

45. Blair personally received Holt's September 25 protected complaint, understood that Holt was accusing management of responsibility, received notice of the RentCafe problem, and later testified under oath in the state-court eviction proceeding, in substance, that she was responsible for blocking or removing

Plaintiffs' portal access before issuance of the October 22, 2024 10-Day Notice that led to the first eviction attempt. Blair also testified, in substance, that management would not accept payment after it entered the eviction process. Blair communicated with Palermo about evidence supporting the October 2024 termination notice and participated in proceeding with enforcement. Plaintiffs therefore allege direct, defendant-specific conduct by Blair connecting knowledge of the protected complaint to multiple challenged tenancy actions.

46. BH controlled day-to-day property management and the resident-management systems, employed or used the on-site management personnel involved in Plaintiffs' tenancy, and administered the account, inspection, charges, and lease-enforcement functions described above. Plaintiffs allege that the relevant BH personnel acted within the scope of their property-management duties.

47. AMZAK owned the Property, was the landlord identified in the 10-Day Notice, and later provided the verified responses concerning the timing and handling of Holt's complaint and the termination notice. Plaintiffs allege that AMZAK acted through its authorized property-management agents in administering and enforcing the tenancy.

**J. Injury**

48. The challenged conduct caused concrete injury, including the documented late charge and pet-related account charges, disruption of ordinary resident-account access, refusal to accept payment after management entered the eviction process, fear of losing the home, humiliation, sleep disturbance, emotional distress, loss of

peace and quiet in the home, and the financial and personal burdens associated with displacement.

49. The later state-court eviction proceeding culminated in an order for possession and a monetary judgment totaling $27,230.52 against Plaintiffs. Plaintiffs allege that the sequence of retaliatory housing actions described above contributed to the circumstances that ultimately resulted in that eviction proceeding and substantial financial exposure. Plaintiffs do not ask this Court to vacate, reverse, reduce, or otherwise alter the state-court judgment, and they do not allege that the entire judgment amount is automatically recoverable as damages in this action. They seek only those damages that the evidence and applicable law permit them to recover for Defendants' alleged Fair Housing Act retaliation.

50. Plaintiffs further allege that the eviction record and resulting displacement substantially impaired their ability to secure replacement housing, forced them to incur continuing hotel and temporary-lodging expenses, and caused continuing emotional distress, humiliation, instability, and disruption to their household. Plaintiffs intend to support these economic losses with receipts, housing-application records, correspondence, and other available evidence.

51. Espinola further alleges that the housing instability, displacement, and burdens associated with obtaining temporary lodging and replacement housing materially interfered with her employment and contributed to the loss of her job. Plaintiffs seek any resulting lost-income or other consequential damages only to the extent they can establish causation and the amount of loss through admissible evidence. Plaintiffs do

not ask the Court at the pleading stage to accept speculative business valuations or unsupported dollar amounts.

## IV. CLAIM FOR RELIEF

### COUNT I - RETALIATION UNDER THE FAIR HOUSING ACT, 42 U.S.C. § 3617

### (Against BH Management Services, LLC, AMZAK Waukegan, LLC, and Katrina Blair)

52. Plaintiffs incorporate paragraphs 1 through 51 as though fully set forth here.

53. Both Plaintiffs engaged in protected activity. Holt reported directly to Property Manager Blair that he believed the towing and parking treatment was discriminatory, stated that the towing vendor was racist, and opposed management's continued use of that vendor after management had become aware of the problem. Holt's good-faith belief was based in part on Blair's own prior statement to him that the towing-company owner had called an employee the N-word. Espinola separately complained to property management that Plaintiffs' vehicle had been wrongfully towed because of racial targeting. Reporting or opposing a discriminatory housing practice to a housing provider is protected activity under the Fair Housing Act. See 24 C.F.R. § 100.400(c)(6). Holt also told Blair that he intended to pursue legal action against Blair and the landlord because he believed management was complacent in allowing the allegedly racist towing vendor to continue harming Plaintiffs.

54. Blair had actual knowledge of Holt's protected activity because she personally received and discussed his complaint while acting as Property Manager. Property management also received Espinola's complaint regarding racial targeting. BH and AMZAK administered the tenancy through their property-management personnel and agents.

55. After the protected complaint, Plaintiffs' shared tenancy was subjected to adverse actions capable of deterring a reasonable tenant from opposing housing discrimination, including the documented loss or alteration of ordinary RentCafe resident access, a late charge during that period, the October 15 inspection and associated charges, the October 22 10-Day termination notice, management's later refusal to accept payment after entering the eviction process, and the resulting eviction proceedings.

56. The facts alleged in paragraphs 15 through 46 plausibly connect Plaintiffs' protected activity to the adverse actions. The causal inference rests not only on timing, but also on Blair's prior tow-yard disclosure concerning the towing-company owner's racist conduct, Blair's direct knowledge of Holt's recorded discrimination complaint, Holt's express challenge to management's responsibility for continuing to use the vendor, Blair's later sworn testimony identifying herself as responsible for the portal restriction and placing that restriction before issuance of the October 22, 2024 10-Day Notice that led to the first eviction attempt, management's refusal to accept payment after entering the eviction process, the absence of a formal investigation or written response to the discrimination complaint before the October 2024 Notice, and Blair's later participation in the enforcement process for that Notice. The causal inference is further supported by Blair's knowledge that Holt had expressly told her he intended to take legal action against Blair and the landlord because he believed management was complacent in allowing the allegedly racist towing vendor to continue harming Plaintiffs.

57. The adverse actions affected both Plaintiffs' shared tenancy, and both Plaintiffs had opposed what they believed to be discriminatory towing. Holt's recorded September 25 complaint establishes direct knowledge by Blair, while Espinola's separate complaint establishes that she too personally engaged in protected activity rather than merely suffering derivative effects from Holt's complaint.

58. To establish retaliation under § 3617, a plaintiff must show protected activity, an adverse action, and a causal connection between the two. Wetzel v. Glen St. Andrew Living Community, LLC, 901 F.3d 856, 868 (7th Cir. 2018). Proof of independent discriminatory animus is not an additional element of a § 3617 retaliation claim. Id.

59. By taking or participating in the adverse housing actions alleged above because Plaintiffs opposed what they in good faith believed to be discriminatory housing conduct, Defendants violated 42 U.S.C. § 3617. Blair is liable for her own alleged participation, and BH and AMZAK are liable to the extent provided by law for actions taken through their personnel and authorized agents in the management and enforcement of Plaintiffs' tenancy.

60. Plaintiffs suffered the injuries described above as a result of the alleged retaliation.

## V. JURY DEMAND

61. Plaintiffs demand a trial by jury on all issues so triable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Alfred Holt and Marilia Coutinho Espinola respectfully request that the Court enter judgment in their favor and against Defendants and award:

A. Compensatory damages in an amount established by the evidence;

B. Nominal damages if warranted by the evidence and law;

C. Punitive damages to the extent permitted by law and supported by the evidence;

D. Costs and any attorney's fees or other fees recoverable under applicable law;

E. Prejudgment and post-judgment interest to the extent permitted by law; and

F. Such other legal or equitable relief as the Court deems just and proper.

Dated: September 21, 2026

Respectfully submitted,

/s/ Alfred Holt
**Alfred Holt, Pro Se**
4105 Bertrand Ln
Beach Park, IL 60099
Phone: (847) 302-3248
Email: albizsmart@gmail.com

/s/ Marilia Coutinho Espinola
**Marilia Coutinho Espinola, Pro Se**
4105 Bertrand Ln
Beach Park, IL 60099
Phone: (847) 302-3248
Email: mariliaholt@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2026, I filed or submitted the foregoing Second Amended Complaint through the Court's authorized filing procedure and served counsel of record in the manner required by Federal Rule of Civil Procedure 5 and the Court's procedures.

/s/ Alfred Holt

/s/ Marilia Coutinho Espinola