**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALFRED HOLT and MARILIA COUTINHO ESPINOLA, | ) | |
| Plaintiffs, | ) | Case No: 1:25-cv-10936 |
| v. | ) | Judge LaShonda A. Hunt |
| BH MANAGEMENT SERVICES, LLC, AMZAK WAUKEGAN, LLC, KATRINA BLAIR, and | ) | Magistrate Judge Keri L. Holleb Hotaling |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

**DEFENDANTS BH MANAGEMENT SERVICES, LLC,
AMZAK WAUKEGAN, LLC, AND KATRINA BLAIR'S
ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants, BH MANAGEMENT SERVICES, LLC ("BH"), AMZAK WAUKEGAN, LLC ("AMZAK"), and KATRINA BLAIR ("BLAIR") (collectively, "Defendants"), by and through their attorneys, Phillip G. Litchfield, Zachary G. Stillman, and Litchfield Cavo LLP, for their for their Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint, state as follows:

**NATURE OF THE ACTION**

1. This is a civil-rights retaliation action under the Fair Housing Act, 42 U.S.C. § 3617. It concerns the housing actions that followed after Plaintiffs Alfred Holt and Marilia Coutinho Espinola complained to property management that the Property's towing practices involved racist and discriminatory targeting. Holt also expressly challenged management's responsibility for continuing to use the towing vendor after management knew of the racism concern.

**<u>ANSWER</u>: Defendants admit that Plaintiffs purport to assert a claim for retaliation under the Fair Housing Act, 42 U.S.C. § 3617. Defendants further admit that Plaintiffs made complaints concerning the towing of their vehicle and the towing vendor. Defendants deny that the Property's towing practices involved racist or discriminatory targeting, deny that Defendants engaged in any retaliatory conduct, and deny the remaining allegations in Paragraph 1, including any characterization of Defendants' knowledge, motives, or responsibility.**

2. On August 31, 2026, the Court dismissed Plaintiffs' First Amended Complaint without prejudice and granted leave to amend. This Second Amended Complaint is filed pursuant to that leave, supersedes the prior complaints, narrows the case to the Fair Housing Act retaliation claim supported by the presently available facts, and pleads specific facts concerning protected activity, knowledge, adverse action, and causal connection.

**<u>ANSWER</u>: Defendants admit that on August 31, 2026, the Court dismissed Plaintiffs' First Amended Complaint without prejudice and granted Plaintiffs leave to amend. Defendants further admit that the Second Amended Complaint was filed pursuant to that leave and supersedes the prior complaints. Defendants deny that the Second Amended Complaint states a viable claim for relief or adequately pleads protected activity, knowledge, adverse action, or causal connection, and deny the remaining allegations in Paragraph 2.**

3. Plaintiffs do not contend that they must prove at the pleading stage that the September 2024 tow itself ultimately violated the Fair Housing Act. The protected activity alleged here includes Holt's explicit, recorded good-faith report of racial discrimination to Property Manager Katrina Blair and Espinola's separate complaint to property management that the vehicle had been wrongfully towed because of racial targeting. Holt's concern about racial discrimination was based in part on information Blair herself had previously given him concerning racist conduct by the towing company's owner.

**<u>ANSWER</u>: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations concerning the contents of any recorded conversation between Holt and Blair or any separate conversation involving Espinola, and therefore deny the same. Defendants deny that Plaintiffs engaged in protected activity within the meaning of 42 U.S.C. § 3617, deny Plaintiffs' characterization of any complaint as a good-faith report of racial discrimination, and deny that Blair provided Holt with information establishing**

**racist or discriminatory conduct by the towing company or its owner. Defendants deny the remaining allegations in Paragraph 3.**

## I. JURISDICTION AND VENUE

4. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343 because Plaintiffs assert a claim under 42 U.S.C. § 3617. A private civil action is authorized by 42 U.S.C. § 3613.

**<u>ANSWER</u>: Defendants admit that the Court has subject-matter jurisdiction over claims properly arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1343 and that 42 U.S.C. § 3613 authorizes private civil actions under the Fair Housing Act. Defendants deny that Plaintiffs have stated a valid claim for relief under 42 U.S.C. § 3617 and deny any remaining allegations in Paragraph 4.**

5. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Waukegan, Illinois, within the Northern District of Illinois.

**<u>ANSWER</u>: Defendants admit that venue is proper in this District because the events alleged in the Second Amended Complaint occurred in Waukegan, Illinois, within the Northern District of Illinois. Defendants deny any remaining allegations in Paragraph 5.**

## II. PARTIES AND RELEVANT ACTORS

6. Plaintiff Alfred Holt ("Holt") is Black and was a tenant and resident of 805 Baldwin Avenue, Apartment 303, Waukegan, Illinois (the "Property") during the events described below.

**<u>ANSWER</u>: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegation that Holt is Black and therefore deny the same. Defendants admit that Holt was a tenant and resident of 805 Baldwin Avenue, Apartment 303, Waukegan, Illinois until entry of the eviction judgment on February 13, 2026, and that he ultimately vacated the Property on or before April 2, 2026. Defendants deny any remaining allegations in Paragraph 6.**

7. Plaintiff Marilia Coutinho Espinola ("Espinola") was Holt's co-tenant at the Property. In connection with the September 2024 towing dispute, Espinola also spoke with property management regarding what she and Holt believed was wrongful towing caused by racial

targeting. The resident account, charges, termination notice, and threatened loss of possession described below affected their shared tenancy.

**<u>ANSWER</u>: Defendants admit that Espinola was Holt's co-tenant at the Property. Defendants deny that Espinola separately complained to property management that Plaintiffs' vehicle had been wrongfully towed because of racial targeting. Defendants admit only that the resident account, charges, termination notice, and possession proceedings concerned Plaintiffs' shared tenancy, and deny any remaining allegations in Paragraph 7.**

8. Defendant AMZAK Waukegan, LLC ("AMZAK") owned the Property and was the landlord identified in the October 2024 10-Day Notice of Termination of Tenancy.

**<u>ANSWER</u>: Defendants admit the allegations in Paragraph 8.**

9. Defendant BH Management Services, LLC ("BH") managed the Property's day-to-day operations, including resident accounts, on-site management personnel, lease administration, enforcement, and vendor relationships.

**<u>ANSWER</u>: Defendants admit the allegations in Paragraph 9.**

10. Defendant Katrina Blair ("Blair") was the Property Manager. Acting in that role, Blair personally received and discussed Holt's September 25, 2024 race-discrimination complaint, was notified of the RentCafe access problem, and participated in management's handling of the October 22, 2024 10-Day Notice. During the later state-court eviction proceeding in Lake County Case No. 2025EV00001817, Plaintiffs were present when Blair testified, in substance, that she was responsible for blocking or removing Plaintiffs' portal access and that she did so before issuance of the October 22, 2024 10-Day Notice that led to Defendants' first eviction attempt. Blair also testified, in substance, that management would not accept payment after it entered the eviction process.

**<u>ANSWER</u>: Defendants admit that Blair was the Property Manager and that, in that capacity, she received and discussed complaints from Holt concerning the September 2024 towing incident, including allegations of discrimination. Defendants further admit that Blair was notified of issues concerning Plaintiffs' RentCafe access and participated in management's**

**handling of the October 22, 2024, 10-Day Notice. Defendants admit that Blair testified during the subsequent state-court eviction proceeding in Lake County Case No. 2025EV00001817, but deny Plaintiffs' characterization of that testimony. Specifically, Defendants deny that Blair testified that management would not accept payment after entering the eviction process. Blair testified that Plaintiffs were restricted from using the online payment portal and from submitting payment by personal check during the pertinent period, but that payment by certified check would have been accepted. Defendants further deny Plaintiffs' allegation that Blair testified that she personally blocked or removed Plaintiffs' portal access before issuance of the October 22, 2024, 10-Day Notice. Defendants deny any remaining allegations in Paragraph 10.**

11. LaQuevia Miller ("Miller") was an Assistant Property Manager employed at the Property. Federico Avalos ("Avalos") was maintenance staff. They are identified because they participated in the October 15, 2024 unit inspection. Michelle Palermo ("Palermo") was a management representative with whom Blair later communicated about enforcement of the 10-Day Notice. Miller, Avalos, and Palermo are not named as Defendants in this Second Amended Complaint.

**ANSWER: Defendants admit that Miller was an Assistant Property Manager at the Property, that Avalos was maintenance staff, and that Miller and Avalos participated in the October 15, 2024, unit inspection. Defendants further admit that Palermo was a management representative and that Blair communicated with Palermo concerning the October 22, 2024, 10-Day Notice. Defendants admit that Miller, Avalos, and Palermo are not named as Defendants in the Second Amended Complaint. Defendants deny any remaining allegations in Paragraph 11.**

## III. FACTUAL ALLEGATIONS

### A. Tenancy Before the Protected Complaint

12. Plaintiffs lived at the Property beginning in approximately 2019. Before September 2024, Plaintiffs had not received a comparable 10-Day termination notice accusing them of drug-paraphernalia or unauthorized-animal violations.

**ANSWER: Defendants admit the allegations in Paragraph 12.**

13. Plaintiffs ordinarily used BH's resident-management system, RentCafe, to access their resident account and manage rent payments and account information.

**ANSWER: Defendants admit the allegations in Paragraph 13.**

**B. September 2024 Tow and Explicit Race-Discrimination Complaint**

14. On or about September 21, 2024, Plaintiffs' vehicle was towed from the Property by TNT Recovery Services ("TNT"), the Property's towing vendor, and a charge of approximately $370 was placed on Plaintiffs' bank card. Plaintiffs disputed the charge. U.S. Bank later made the $370 provisional credit final. Plaintiffs do not allege that the bank made a separate finding that the tow was fraudulent.

**ANSWER: Defendants admit that, on or about September 21, 2024, Plaintiffs' vehicle was towed from the Property by TNT Recovery Services and that TNT was the Property's towing vendor. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 14, including the amount or manner of any charge to Plaintiffs' bank card, Plaintiffs' dispute of that charge, and any action taken by U.S. Bank, and therefore deny the same.**

15. At or near the time of the tow, Holt documented another vehicle encroaching into Plaintiffs' parking area that remained after Plaintiffs' vehicle was towed. That photograph formed part of Holt's basis for questioning the towing practices. Plaintiffs do not allege that the photograph, standing alone, proves the race of the other vehicle's owner or conclusively establishes racial discrimination.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 15 and therefore deny the same.**

16. During the first towing incident, Holt and Blair were both present at the towing yard. Blair was there in connection with the towing of her daughter's vehicle, which had also been towed. During that encounter, Blair told Holt that the owner of the towing company had called one of his own employees the N-word. That tow-yard conversation was not recorded; Holt alleges Blair's statement based on his personal recollection of the conversation. Before Blair made that

disclosure, Holt had no information leading him to believe that TNT or its owner had engaged in racist conduct.

**ANSWER: Defendants admit that Holt and Blair were both present at the towing yard and that Blair was present in connection with the towing of vehicles belonging to herself and her daughter. Defendants further admit that Blair told Holt she had previously heard an allegation from a TNT employee that TNT's owner had used inappropriate language. Defendants deny that Blair personally heard TNT's owner use inappropriate language or otherwise had personal knowledge that TNT or its owner had engaged in racist conduct. Defendants lack knowledge or information sufficient to form a belief as to Holt's alleged personal beliefs or information known to him before that encounter and therefore deny the same. Defendants deny any remaining allegations in Paragraph 16.**

17. On September 25, 2024, Holt spoke directly with Blair in a recorded conversation. Holt told Blair that improperly parked vehicles were not being towed while his vehicle had been towed, and he expressly stated that "it's discrimination" and "we're being targeted." Holt also raised the towing vendor's racism. His complaint was based in part on Blair's earlier tow-yard disclosure concerning the towing-company owner's use of the N-word toward an employee. In connection with the same towing dispute, Espinola also separately spoke with property management and complained that Plaintiffs' vehicle had been wrongfully towed because of racial targeting. In discussing the towing dispute with Blair during this period, Holt also told Blair, in substance, that he intended to take legal action against Blair and the landlord because he believed they were being complacent in allowing a racist towing vendor to terrorize him and Espinola.

**ANSWER: Defendants admit that Holt spoke with Blair on or about September 25, 2024. Defendants lack knowledge or information sufficient to form a belief as to whether that conversation was recorded or as to the truth or falsity of Plaintiffs' characterization of the contents of any such recording, including the quoted statements attributed to Holt, and therefore deny the same. Defendants admit that, during a prior conversation at the towing yard, Blair advised Holt that she had heard an allegation from a TNT employee that the towing-company owner had used inappropriate language toward an employee. Defendants deny that Blair personally heard the towing-company owner use such language or represented to Holt that she had personal knowledge of discriminatory conduct by TNT or its owner. Defendants deny that Espinola separately spoke with property management and complained that Plaintiffs' vehicle had been wrongfully towed because of racial targeting. Defendants further lack knowledge or information sufficient to form a belief as to Holt's**

**subjective reasons for making any complaint and therefore deny the same. Defendants deny any remaining allegations in Paragraph 17.**

18. Blair immediately showed that she understood Holt's complaint implicated management, not merely the towing company. Blair asked Holt, "are you blaming me at this point or are you blaming them?" Holt responded, in substance, that Blair had hired the vendor.

**ANSWER: Defendants deny the allegations in Paragraph 18, including Plaintiffs' characterization of the statements made during the conversation and Blair's alleged understanding or state of mind.**

19. Holt then challenged management's continued relationship with the vendor after learning of racist conduct, including the conduct Blair had previously described to him at the towing yard. Holt told Blair, in substance, that continuing the contract after identifying the vendor as racist implicated management's own responsibility. In the recorded September 25 conversation, when Holt reminded Blair that she had identified the towing company as racist, Blair responded, "They are," and explained that she was already under contract with the towing company and needed a towing company until another could be obtained.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations concerning Holt's statements, whether the September 25 conversation was recorded, or the quoted statement attributed to Blair that "They are," and therefore deny the same. Defendants admit that Blair had previously advised Holt that she had heard allegations from one of TNT's employees that TNT's owner had used racist language with his employees. Defendants further admit that Blair advised Holt that management was looking for another towing vendor but that the Property needed to maintain towing services until another vendor could be obtained. Defendants deny that Blair represented that she had personal knowledge that TNT or its owner was racist, and deny any remaining allegations in Paragraph 19.**

20. During the same conversation, Blair said the parking photograph was "kind of proof that there is definitely something weird about that," stated that she had been through or discussed similar issues with the same people, and referred to tenants going to the vendor and having those kinds of conversations. Blair stated that she did not want tenants put in that position.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the specific statements attributed to Blair in Paragraph 20 and therefore deny the same. Defendants admit that Blair had concerns regarding certain aspects of TNT's towing practices and had been looking for an alternative towing vendor but deny Plaintiffs' characterization of any such concerns as evidence of racial discrimination or discriminatory towing. Defendants deny any remaining allegations in Paragraph 20.**

21. Plaintiffs' complaints therefore did more than challenge a single tow. Holt expressly opposed what he believed in good faith was race-based housing treatment, a belief informed in part by Blair's own prior disclosure about the towing-company owner's racist conduct, and directly challenged management's decision to continue using the vendor after management had become aware of the racism concern. Espinola separately complained to property management that the towing of Plaintiffs' vehicle resulted from racial targeting. Holt's opposition therefore placed Blair on notice not only that he believed racial discrimination was occurring, but also that he intended to hold Blair and the landlord legally accountable because he believed management was complacent in allowing the allegedly racist vendor to continue harming Plaintiffs.

**ANSWER: Defendants admit that Holt complained to Blair concerning the towing of Plaintiffs' vehicle and alleged that the towing was discriminatory. Defendants further admit that Blair had previously advised Holt that she had heard an allegation from one of TNT's employees that TNT's owner had used racist language with his employees, and that management continued using TNT while seeking an alternative towing vendor because the Property required towing services. Defendants deny Plaintiffs' characterization that Blair or management had personal knowledge of racist or discriminatory conduct by TNT or its owner. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations concerning any separate complaint by Espinola or Holt's subjective beliefs, motives, or intent to pursue legal action, and therefore deny the same. Defendants deny any remaining allegations in Paragraph 21.**

### C. Management Did Not Formally Investigate the Discrimination Complaint Before the Termination Notice

22. In verified responses later filed in the related state-court litigation, AMZAK admitted that no formal internal investigation was conducted regarding Holt's verbal complaint before the 10-Day Notice was issued.

**ANSWER: Defendants deny that AMZAK filed verified responses in any related state-court litigation or made the admission attributed to it in Paragraph 22. Defendants further state that the October 22, 2024, 10-Day Notice was issued based upon conditions observed during the October 15, 2024 unit inspection, including marijuana-related items and drug paraphernalia, and deny any implication that the Notice was issued without investigation or a factual basis concerning the alleged lease violations.**

23. AMZAK also admitted that it possessed no written documentation showing that Holt's verbal complaint was investigated, reviewed, or responded to before issuance of the 10-Day Notice.

**ANSWER: Defendants deny that AMZAK made the admission attributed to it in Paragraph 23 or otherwise possessed the written documentation referenced therein. Defendants admit that BH did not possess written documentation reflecting that Holt's verbal complaint was separately reviewed or responded to before issuance of the October 22, 2024, 10-Day Notice. Defendants further state, however, that the October 15, 2024, unit inspection constituted an investigation into potential lease violations and resulted in observations and photographic evidence concerning marijuana-related items, drug paraphernalia, and an unauthorized pet. Defendants deny any implication that the 10-Day Notice was issued without investigation or factual basis and deny any remaining allegations in Paragraph 23.**

24. Plaintiffs plead those admissions narrowly. They concern the handling of Holt's discrimination complaint. Plaintiffs do not characterize those admissions as an admission that management possessed no photographs or conducted no inquiry concerning the later alleged lease violations.

**ANSWER: Defendants deny that AMZAK made the admissions attributed to it in Paragraphs 22 and 23 or filed the verified responses referenced therein. Defendants admit that Plaintiffs purport to characterize the matters alleged in Paragraphs 22 and 23 as concerning the handling of Holt's discrimination complaint and do not allege that management lacked photographs or conducted no inquiry concerning the alleged lease violations. Defendants further state that management possessed photographic evidence obtained during the October 15, 2024, inspection and investigated the alleged lease violations before proceeding with the October 22, 2024, 10-Day Notice. Defendants deny any remaining allegations in Paragraph 24.**

**D. RentCafe Resident-Account Status Changed Within Days**

25. By September 30, 2024, only days after Holt's September 25 discrimination complaint and during the same period in which Espinola also complained to property management

about racial targeting, Plaintiffs' RentCafe account displayed the message: "You are not currently listed as a resident. Please contact your property management company for more information."

**<u>ANSWER</u>: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 25 concerning the specific message allegedly displayed on Plaintiffs' RentCafe account as of September 30, 2024, and therefore deny the same. Defendants further deny Plaintiffs' characterization of Holt's September 25 complaint and any alleged complaint by Espinola as establishing racial targeting or protected activity.**

26. On September 30, 2024, Espinola emailed Blair to report the resident-account access problem and requested the exact balance due. Blair therefore had actual notice that the shared resident account was no longer functioning in the ordinary manner shortly after Holt's complaint.

**<u>ANSWER</u>: Defendants admit that, on September 30, 2024, Espinola emailed Blair regarding Plaintiffs' resident-account access and requested the balance due. Defendants deny that the email established that Plaintiffs' shared resident account was no longer functioning in the ordinary manner and deny that Blair thereby had actual notice of the circumstances alleged by Plaintiffs. Defendants deny any remaining allegations in Paragraph 26.**

27. The identity of the person responsible for the RentCafe restriction is no longer unknown to Plaintiffs. During the state-court trial in Lake County Case No. 2025EV00001817, Plaintiffs were present when Blair testified under oath, in substance, that she was responsible for blocking or removing Plaintiffs' portal access and that she did so before issuance of the October 22, 2024 10-Day Notice that formed the basis of Defendants' first eviction attempt. Blair further testified, in substance, that management would not accept payment after it entered the eviction process. Plaintiffs allege this testimony directly identifies Blair as the management actor responsible for the portal restriction and, according to Blair's own sworn account, places that adverse action before the October 22 termination notice.

**<u>ANSWER</u>: Defendants admit that Blair testified during the state-court eviction proceeding in Lake County Case No. 2025EV00001817 but deny Plaintiffs' characterization of that testimony. Defendants specifically deny that Blair testified that she personally blocked or removed Plaintiffs' RentCafe access before issuance of the October 22, 2024, 10-Day Notice.**

**Defendants further deny that Blair testified that management would not accept payment after entering the eviction process. Rather, Blair testified that Plaintiffs were restricted from using the online payment portal and from submitting payment by personal check during the pertinent period, but that payment by certified check would have been accepted. Defendants deny the remaining allegations in Paragraph 27.**

28. BH's ledger reflects that on October 4, 2024, a $140 late charge was posted and that a separate "Flex" payment of $1,688.39 was credited the same day. Plaintiffs acknowledge that record and do not allege that RentCafe was literally the only conceivable way a payment could ever be transmitted.

**ANSWER: Defendants admit that BH's ledger reflects a $140 late charge posted on October 4, 2024, and a separate "Flex" payment of $1,688.39 credited that same day. Defendants further state that late charges were automatically assessed when rent remained unpaid after the third day of the month. Defendants admit that Plaintiffs do not allege that RentCafe was the only conceivable method by which payment could be transmitted and deny any implication that the October 4, 2024, late charge was manually imposed for a retaliatory or improper purpose.**

29. Plaintiffs' narrower allegation is that their ordinary resident-account access had been deliberately disabled or changed to a status stating that they were not listed as residents, and that a late fee was posted during that period. Blair's later state-court testimony, as alleged above, identifies her as responsible for that restriction and places her action before the October 22, 2024, 10-Day Notice. Plaintiffs further allege that, once management moved into the eviction process, management refused to accept payment, which compounded the payment disruption and account consequences.

**ANSWER: Defendants deny that Plaintiffs' resident-account access was deliberately disabled for any retaliatory or improper purpose and deny Plaintiffs' characterization of Blair's state-court testimony. Defendants specifically deny that Blair testified that she personally blocked or removed Plaintiffs' RentCafe access before issuance of the October 22, 2024, 10-Day Notice. Defendants further deny that management refused to accept payment after entering the eviction process. Rather, Blair testified that Plaintiffs were restricted from using the online payment portal and from submitting payment by personal check during the pertinent period, but that payment by certified check would have been accepted. To the extent Plaintiffs allege that a late fee was posted to their account during this period, Defendants admit only the objective account entry as reflected in the ledger and deny any**

**improper or retaliatory characterization of that charge. Defendants deny any remaining allegations in Paragraph 29.**

**E. October 15 Inspection, Immediate Charges, and October 22 Termination Notice**

30. On October 15, 2024, approximately three weeks after Holt's recorded protected complaint and after Espinola had also complained to property management about racial targeting, Miller and Avalos entered Plaintiffs' apartment for an inspection. Plaintiffs allege that they received no advance notice and did not consent to the entry. Holt was inside the apartment and was showering when the entry occurred.

**ANSWER: Defendants deny Plaintiffs' characterization of Holt's September 25 complaint as protected activity under the Fair Housing Act. Defendants admit that Miller and Avalos entered Plaintiffs' apartment on October 15, 2024, for an inspection and that Holt was present in the apartment and showering at the time of entry. Defendants deny that Plaintiffs received no advance notice of the inspection and deny any allegation that the entry was unauthorized or improper. Defendants deny any remaining allegations in Paragraph 30.**

31. BH's own ledger reflects three charges posted on October 15, 2024: a $100 charge described as an unauthorized or unknown pet during the unit inspection, a $300 pet deposit for an unauthorized cat found during the inspection, and $30 in rent for an unauthorized pet, totaling $430 in pet-related charges.

**ANSWER: Defendants admit that BH's ledger reflects the three pet-related charges identified in Paragraph 31, totaling $430, and further state that those charges were assessed based upon the unauthorized-pet findings from the October 15, 2024, inspection. Defendants further state that the pet-related charges, along with other fees assessed during the pendency of the First Eviction Action, were later adjusted or waived following dismissal of that proceeding. Defendants deny any implication that the charges were imposed for a retaliatory, discriminatory, or otherwise improper purpose.**

32. On or about October 22, 2024, AMZAK served a 10-Day Notice of Termination of Tenancy. The Notice expressly tied the alleged violations to the October 15 inspection and alleged, among other things, an unauthorized cat and "various drug paraphernalia" related to the alleged use of marijuana and/or tobacco.

**ANSWER: Defendants admit the allegations in Paragraph 32.**

33. Plaintiffs deny using marijuana in the apartment and deny maintaining an unauthorized pet in violation of the lease. Plaintiffs dispute management's characterization of what the October 15 inspection established. Plaintiffs do not allege that the inspection never occurred or that management possessed no photographs.

**ANSWER: Defendants deny Plaintiffs' allegations that they were not in violation of the lease. Defendants admit that the October 15, 2024, inspection occurred and that management obtained photographs clearly documenting marijuana-related items, drug paraphernalia, and evidence of an unauthorized pet in the apartment. Defendants further state that Holt subsequently advised management in writing that he had disposed of the marijuana-related items and made arrangements regarding the unauthorized cat in order to bring the apartment into compliance with the lease. Defendants deny any remaining allegations in Paragraph 33.**

34. AMZAK's verified state-court responses state that the 10-Day Notice was issued within a few weeks after Holt made his verbal complaint to property staff.

**ANSWER: Defendants deny that AMZAK filed verified responses in any related state-court litigation or made the statement attributed to it in Paragraph 34. Defendants admit that the October 22, 2024, 10-Day Notice was issued within several weeks after Holt made a verbal complaint to property staff. Defendants deny that the timing of the Notice was related to Holt's complaint or that the Notice was issued for any retaliatory or discriminatory purpose. Defendants further state that the Notice was based upon conditions observed during the October 15, 2024, inspection and the resulting lease violations.**

35. Those verified responses further state that Blair contacted Palermo regarding enforcement, that Palermo asked whether the Property had photographic evidence of drug paraphernalia and marijuana, that Blair confirmed that management had photographs, and that Blair was instructed to proceed with enforcement of the 10-Day Notice.

**ANSWER: Defendants deny that AMZAK filed verified responses in any related state-court litigation or made the statements attributed to it in Paragraph 35. Defendants admit, however, that Blair contacted Palermo regarding enforcement of the October 22, 2024, 10-Day Notice, that Palermo inquired whether management possessed photographic evidence of drug paraphernalia and marijuana, that Blair confirmed that management had such photographs, and that Blair was instructed to proceed with enforcement of the Notice. Defendants deny any remaining allegations in Paragraph 35.**

36. Thus, Blair was both the Property Manager who personally received Holt's protected race-discrimination complaint and a management participant in the decision-making process that led to enforcement of the termination notice only weeks later.

**ANSWER: Defendants deny Plaintiffs' characterization of Holt's complaint as protected activity under the Fair Housing Act. Defendants further deny that Blair participated in the decision-making process that resulted in issuance of the October 22, 2024, 10-Day Notice. To the extent Blair was involved in implementing or communicating the Notice, Defendants state that she acted pursuant to direction from management based on the conditions observed during the October 15, 2024, inspection and the resulting lease violations. Defendants deny any remaining allegations in Paragraph 36.**

**F. Continued Use of the Same Towing Vendor and Second Tow After the Protected Complaint**

37. On or about November 22, 2024, after Plaintiffs had complained to property management about racial discrimination, after Holt had challenged management's continued use of TNT, and after Holt had advised Blair that he intended to pursue legal action against Blair and the landlord concerning that conduct, TNT again towed Plaintiffs' vehicle from the Property. On November 23, 2024, Holt contemporaneously emailed Blair and Property management concerning the second tow and documented another vehicle encroaching into Plaintiffs' parking space that had not been towed.

**ANSWER: Defendants admit that TNT towed Plaintiffs' vehicle from the Property on or about November 22, 2024, and that Holt subsequently communicated with Blair and property management regarding the tow. Defendants deny Plaintiffs' characterization of the tow as retaliatory or discriminatory and deny that Blair, BH, or AMZAK directed, requested, or authorized TNT to tow Plaintiffs' vehicle. Defendants further lack knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations concerning Holt's alleged prior statements regarding legal action or the circumstances of any other vehicle allegedly encroaching into Plaintiffs' parking space and therefore deny the same. Defendants deny any remaining allegations in Paragraph 37.**

38. Holt recorded his subsequent conversation with TNT's owner concerning the second tow. During that recorded conversation, the owner stated, in substance, that he did not have

the paperwork concerning the tow and therefore did not know why Plaintiffs' vehicle had been towed. The owner then attributed responsibility for the tow to his employees. After Holt told the owner that he was responsible for the conduct of his employees, the owner agreed to release Plaintiffs' vehicle without requiring payment of a towing or release fee. Holt also told TNT that he had already complained about racism and intended to pursue legal action concerning the towing conduct.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to whether Holt recorded a conversation with TNT's owner or as to the truth or falsity of Plaintiffs' characterization of the contents of any such conversation and therefore deny the same. Defendants admit that Plaintiffs' vehicle was towed by TNT on or about November 22, 2024, and that Blair thereafter contacted TNT regarding the tow. Defendants further state that Blair had previously requested that Plaintiffs' vehicle not be towed and, after learning of the November tow, contacted TNT and advised that the vehicle had been towed in error. Defendants admit that Plaintiffs' vehicle was ultimately released without requiring payment of a towing or release fee. Defendants deny any remaining allegations in Paragraph 38.**

39. Holt informed Blair that TNT's owner had said he lacked the paperwork explaining why Plaintiffs' vehicle had been towed and that TNT had released the vehicle without charge after Holt disputed the tow; Blair responded, "great." Plaintiffs do not presently allege that Blair personally ordered or authorized the November tow. Plaintiffs allege the second tow as additional context showing that, after management had actual notice of Plaintiffs' discrimination complaint and Holt's legal challenge to management's continued use of TNT, Plaintiffs remained exposed to the same vendor and experienced another disputed tow that the vendor ultimately resolved without charging them.

**ANSWER: Defendants admit that Holt informed Blair that TNT's owner had stated he lacked the paperwork explaining why Plaintiffs' vehicle had been towed and that TNT had released the vehicle without charge after Holt disputed the tow. Defendants further admit that Blair responded, "great." Defendants admit that Blair did not order or authorize the November 2024 tow. Defendants further admit that, after learning of the tow, Blair contacted TNT, advised that Plaintiffs' vehicle had been towed in error, and that the vehicle was ultimately released without charge. Defendants deny Plaintiffs' characterization of the**

**November tow as supporting any inference of retaliation, discrimination, or improper conduct by Defendants, and deny any remaining allegations in Paragraph 39.**

**G. Facts Supporting the Causal Connection**

40. Plaintiffs do not rely on temporal proximity alone. The causal allegation rests on the combined facts set out above: Blair herself had previously supplied Holt with specific information concerning racist conduct by the towing-company owner; both Plaintiffs complained to property management about racial targeting; Blair personally knew of Holt's explicit complaint and understood that Holt was criticizing management's own role; Plaintiffs' resident-account status changed within days; Blair was notified of the access problem; Blair later testified under oath in the state-court eviction proceeding, in substance, that she herself was responsible for blocking or removing the portal access and that she did so before issuance of the October 22, 2024 10-Day Notice that led to the first eviction attempt; management thereafter refused to accept payment after it entered the eviction process; the October 15 inspection and immediate charges followed; the October 22 Notice expressly relied on that inspection; and Blair participated in the evidence-confirmation and enforcement process for that Notice. Blair also knew that Holt had expressly told her he intended to take legal action against her and the landlord because he believed management was complacent in allowing the allegedly racist towing vendor to continue harming him and Espinola. After those events, the same vendor towed Plaintiffs' vehicle again, and Blair was informed that TNT's owner had said he lacked the paperwork explaining the reason for the tow and that TNT released the vehicle without charge after Holt disputed it.

**<u>ANSWER</u>: Defendants deny the allegations in Paragraph 40 to the extent they assert or imply a causal connection between Plaintiffs' complaints and any subsequent action by Defendants. Defendants further deny Plaintiffs' characterization of Blair's statements, knowledge, state-court testimony, or involvement in the RentCafe restriction and deny that management refused to accept payment as alleged. Defendants admit only the objective occurrence of certain events previously admitted in response to the corresponding paragraphs above, including the September 2024 towing dispute, the October 15, 2024**

**inspection, issuance of the October 22, 2024 10-Day Notice, the subsequent November 2024 tow by TNT, and the ultimate release of Plaintiffs' vehicle without charge. Defendants deny that those events, individually or collectively, support any inference of retaliation, discrimination, or other wrongful conduct and deny any remaining allegations in Paragraph 40.**

41. Blair's agreement that the towing vendor had a racism problem does not eliminate the alleged retaliatory motive. The recorded conversation shows why the complaint could create friction with management: Blair specifically asked whether Holt was blaming her, and Holt responded by pointing to management's decision to hire and continue using the vendor. The protected complaint therefore accused management itself of responsibility, not merely a third-party vendor. Holt also expressly told Blair that he intended to take legal action against Blair and the landlord because he believed they were complacent in allowing the allegedly racist vendor to continue harming Plaintiffs. That statement made clear that Holt's complaint directly challenged management's own responsibility and exposed management personnel and the landlord to potential legal consequences.

**ANSWER: Defendants deny the allegations in Paragraph 41.**

42. The lack of a formal investigation or written response to Holt's discrimination complaint, when considered together with the rapid sequence of adverse tenancy actions that followed, supports Plaintiffs' allegation that the complaint was followed by an enforcement response rather than a meaningful response to the discrimination concern.

**ANSWER: Defendants deny the allegations in Paragraph 42.**

43. For any other internal BH action whose responsible employee or system user is not presently known to Plaintiffs, Plaintiffs say so expressly rather than attributing the act indiscriminately to every Defendant. Plaintiffs expect BH's system records and discovery to identify any additional responsible internal actor or actors.

**<u>ANSWER</u>: Defendants lack knowledge or information sufficient to form a belief as to Plaintiffs' present knowledge concerning the identity of any additional BH employee or system user and therefore deny the same. Defendants further deny that discovery will establish any additional wrongful, discriminatory, or retaliatory conduct by BH personnel and deny any remaining allegations in Paragraph 43.**

**H. First State-Court Eviction Proceeding and Voluntary Dismissal**

44. The first state-court eviction proceeding arising from the October 22, 2024 10-Day Notice was filed in the Circuit Court of Lake County as Case No. 2024EV00001836. That proceeding remained pending for months and was voluntarily dismissed without prejudice on July 23, 2025. Plaintiffs rely on the existence, chronology, and disposition of that proceeding as part of the sequence of housing actions that followed their protected complaints. Plaintiffs do not allege that the voluntary dismissal, standing alone, proves that the underlying eviction allegations were false or that the proceeding was retaliatory.

**<u>ANSWER</u>: Defendants admit that the first state-court eviction proceeding arising from the October 22, 2024, 10-Day Notice was filed in the Circuit Court of Lake County as Case No. 2024EV00001836, remained pending for a period of time, and was voluntarily dismissed without prejudice on July 23, 2025. Defendants deny Plaintiffs' characterization of that proceeding as part of any retaliatory sequence of housing actions or as otherwise supporting an inference of retaliation or discrimination. Defendants admit that Plaintiffs do not allege that the voluntary dismissal, standing alone, proves that the underlying eviction allegations were false or retaliatory. Defendants deny any remaining allegations in Paragraph 44.**

**I. Defendant-Specific Conduct**

45. Blair personally received Holt's September 25 protected complaint, understood that Holt was accusing management of responsibility, received notice of the RentCafe problem, and later testified under oath in the state-court eviction proceeding, in substance, that she was responsible for blocking or removing Plaintiffs' portal access before issuance of the October 22, 2024 10-Day Notice that led to the first eviction attempt. Blair also testified, in substance, that management would not accept payment after it entered the eviction process. Blair communicated with Palermo about evidence supporting the October 2024 termination notice and participated in

proceeding with enforcement. Plaintiffs therefore allege direct, defendant-specific conduct by Blair connecting knowledge of the protected complaint to multiple challenged tenancy actions.

**ANSWER: Defendants admit that Blair received Holt's September 25, 2024, complaint and was notified of issues concerning Plaintiffs' RentCafe access. Defendants deny Plaintiffs' characterization of Holt's complaint as protected activity under the Fair Housing Act and deny Plaintiffs' characterization of Blair's understanding of that complaint. Defendants further deny that Blair testified in the state-court eviction proceeding that she personally blocked or removed Plaintiffs' portal access before issuance of the October 22, 2024, 10-Day Notice, and deny that Blair testified that management would not accept payment after entering the eviction process. Defendants admit that Blair communicated with Palermo regarding evidence supporting the October 22, 2024 10-Day Notice, that Palermo inquired whether management possessed photographic evidence of the alleged lease violations, that Blair confirmed such photographs existed, and that Blair was instructed to proceed with enforcement of the Notice. Defendants deny that Blair's conduct establishes any causal connection between Holt's complaint and any challenged tenancy action and deny any remaining allegations in Paragraph 45.**

46. BH controlled day-to-day property management and the resident-management systems, employed or used the on-site management personnel involved in Plaintiffs' tenancy, and administered the account, inspection, charges, and lease-enforcement functions described above. Plaintiffs allege that the relevant BH personnel acted within the scope of their property-management duties.

**ANSWER: Defendants admit that BH managed the day-to-day operations of the Property, utilized on-site management personnel in connection with Plaintiffs' tenancy, and administered resident accounts, inspections, charges, and lease-enforcement functions. Defendants further admit that BH personnel acted within the scope of their respective property-management duties to the extent established by the facts and applicable law. Defendants deny any characterization of those functions or actions as wrongful, discriminatory, or retaliatory, and deny any remaining allegations in Paragraph 46.**

47. AMZAK owned the Property, was the landlord identified in the 10-Day Notice, and later provided the verified responses concerning the timing and handling of Holt's complaint and the termination notice. Plaintiffs allege that AMZAK acted through its authorized property-management agents in administering and enforcing the tenancy.

**ANSWER: Defendants admit that AMZAK owned the Property and was identified as the landlord in the October 22, 2024, 10-Day Notice. Defendants deny that AMZAK provided the verified responses referenced in Paragraph 47 or otherwise participated in the related state-court litigation as alleged. Defendants admit that AMZAK acted through property-management personnel and agents in administering and enforcing the tenancy, but deny any characterization of those actions as wrongful, discriminatory, or retaliatory. Defendants deny any remaining allegations in Paragraph 47.**

**J. Injury**

48. The challenged conduct caused concrete injury, including the documented late charge and pet-related account charges, disruption of ordinary resident-account access, refusal to accept payment after management entered the eviction process, fear of losing the home, humiliation, sleep disturbance, emotional distress, loss of peace and quiet in the home, and the financial and personal burdens associated with displacement.

**ANSWER: Defendants deny the allegations in Paragraph 48.**

49. The later state-court eviction proceeding culminated in an order for possession and a monetary judgment totaling $27,230.52 against Plaintiffs. Plaintiffs allege that the sequence of retaliatory housing actions described above contributed to the circumstances that ultimately resulted in that eviction proceeding and substantial financial exposure. Plaintiffs do not ask this Court to vacate, reverse, reduce, or otherwise alter the state-court judgment, and they do not allege that the entire judgment amount is automatically recoverable as damages in this action. They seek only those damages that the evidence and applicable law permit them to recover for Defendants' alleged Fair Housing Act retaliation.

**ANSWER: Defendants admit that the later state-court eviction proceeding resulted in an order for possession and a monetary judgment in the amount of $27,230.52 against Plaintiffs. Defendants deny the remaining allegations in Paragraph 49, including Plaintiffs' characterization of any prior conduct as retaliatory and any allegation that such conduct caused or contributed to the eviction proceeding or Plaintiffs' claimed damages.**

50. Plaintiffs further allege that the eviction record and resulting displacement substantially impaired their ability to secure replacement housing, forced them to incur continuing hotel and temporary-lodging expenses, and caused continuing emotional distress, humiliation, instability, and disruption to their household. Plaintiffs intend to support these economic losses with receipts, housing-application records, correspondence, and other available evidence.

**ANSWER: Defendants deny the allegations in Paragraph 50. Defendants further state that, at Holt's request, the state court impounded the eviction case so that the eviction record would not adversely affect his ability to secure replacement housing. See Exhibit A to Defendants' Reply in Support of Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 43-1. Defendants deny that the eviction record or Defendants' alleged conduct impaired Plaintiffs' ability to obtain replacement housing or caused the other damages alleged in Paragraph 50.**

51. Espinola further alleges that the housing instability, displacement, and burdens associated with obtaining temporary lodging and replacement housing materially interfered with her employment and contributed to the loss of her job. Plaintiffs seek any resulting lost-income or other consequential damages only to the extent they can establish causation and the amount of loss through admissible evidence. Plaintiffs do not ask the Court at the pleading stage to accept speculative business valuations or unsupported dollar amounts.

**ANSWER: Defendants deny the allegations in Paragraph 51.**

## IV. CLAIM FOR RELIEF

## COUNT I - RETALIATION UNDER THE FAIR HOUSING ACT, 42 U.S.C. § 3617

## (Against BH Management Services, LLC, AMZAK Waukegan, LLC, and Katrina Blair)

52. Plaintiffs incorporate paragraphs 1 through 51 as though fully set forth here.

**ANSWER: Defendants incorporate by reference their responses to Paragraphs 1 through 51 as though fully set forth herein, as their Answer to Paragraph 52.**

53. Both Plaintiffs engaged in protected activity. Holt reported directly to Property Manager Blair that he believed the towing and parking treatment was discriminatory, stated that the towing vendor was racist, and opposed management's continued use of that vendor after

management had become aware of the problem. Holt's good-faith belief was based in part on Blair's own prior statement to him that the towing-company owner had called an employee the N-word. Espinola separately complained to property management that Plaintiffs' vehicle had been wrongfully towed because of racial targeting. Reporting or opposing a discriminatory housing practice to a housing provider is protected activity under the Fair Housing Act. See 24 C.F.R. § 100.400(c)(6). Holt also told Blair that he intended to pursue legal action against Blair and the landlord because he believed management was complacent in allowing the allegedly racist towing vendor to continue harming Plaintiffs.

**ANSWER: Defendants deny the allegations in Paragraph 53. To the extent Paragraph 53 states legal conclusions regarding what constitutes protected activity under the Fair Housing Act or the legal effect of 24 C.F.R. § 100.400(c)(6), no response is required. To the extent a response is deemed required, Defendants deny that Plaintiffs engaged in protected activity as alleged and deny any remaining allegations in Paragraph 53.**

54. Blair had actual knowledge of Holt's protected activity because she personally received and discussed his complaint while acting as Property Manager. Property management also received Espinola's complaint regarding racial targeting. BH and AMZAK administered the tenancy through their property-management personnel and agents.

**ANSWER: Defendants deny that Blair had actual knowledge of any legally protected activity by Holt and deny Plaintiffs' characterization of Holt's complaint as protected activity under the Fair Housing Act. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations concerning any separate complaint by Espinola regarding racial targeting, and therefore deny the same. Defendants admit that BH and AMZAK administered Plaintiffs' tenancy through property-management personnel and agents. Defendants deny any remaining allegations in Paragraph 54.**

55. After the protected complaint, Plaintiffs' shared tenancy was subjected to adverse actions capable of deterring a reasonable tenant from opposing housing discrimination, including the documented loss or alteration of ordinary RentCafe resident access, a late charge during that period, the October 15 inspection and associated charges, the October 22 10-Day termination

notice, management's later refusal to accept payment after entering the eviction process, and the resulting eviction proceedings.

**ANSWER: Defendants deny that Plaintiffs engaged in protected activity as alleged and deny Plaintiffs' characterization of the events identified in Paragraph 55 as retaliatory adverse actions under the Fair Housing Act. Defendants admit that Plaintiffs experienced changes to their RentCafe access, that certain charges were assessed to their account, that an inspection occurred on October 15, 2024, that a 10-Day Notice was issued on October 22, 2024, and that eviction proceedings were subsequently pursued. Defendants deny that management refused to accept payment as alleged and deny any remaining allegations in Paragraph 55.**

56. The facts alleged in paragraphs 15 through 46 plausibly connect Plaintiffs' protected activity to the adverse actions. The causal inference rests not only on timing, but also on Blair's prior tow-yard disclosure concerning the towing-company owner's racist conduct, Blair's direct knowledge of Holt's recorded discrimination complaint, Holt's express challenge to management's responsibility for continuing to use the vendor, Blair's later sworn testimony identifying herself as responsible for the portal restriction and placing that restriction before issuance of the October 22, 2024 10-Day Notice that led to the first eviction attempt, management's refusal to accept payment after entering the eviction process, the absence of a formal investigation or written response to the discrimination complaint before the October 2024 Notice, and Blair's later participation in the enforcement process for that Notice. The causal inference is further supported by Blair's knowledge that Holt had expressly told her he intended to take legal action against Blair and the landlord because he believed management was complacent in allowing the allegedly racist towing vendor to continue harming Plaintiffs.

**ANSWER: Defendants deny the allegations in Paragraph 56.**

57. The adverse actions affected both Plaintiffs' shared tenancy, and both Plaintiffs had opposed what they believed to be discriminatory towing. Holt's recorded September 25 complaint establishes direct knowledge by Blair, while Espinola's separate complaint establishes that she too

personally engaged in protected activity rather than merely suffering derivative effects from Holt's complaint.

**ANSWER: Defendants deny the allegations in Paragraph 57.**

58. To establish retaliation under § 3617, a plaintiff must show protected activity, an adverse action, and a causal connection between the two. Wetzel v. Glen St. Andrew Living Community, LLC, 901 F.3d 856, 868 (7th Cir. 2018). Proof of independent discriminatory animus is not an additional element of a § 3617 retaliation claim. Id.

**ANSWER: Paragraph 58 states legal conclusions to which no response is required. To the extent a response is deemed required, Defendants admit that *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856 (7th Cir. 2018), addresses the elements of a retaliation claim under 42 U.S.C. § 3617, but deny Plaintiffs' characterization of the law to the extent inconsistent with that decision or other applicable authority.**

59. By taking or participating in the adverse housing actions alleged above because Plaintiffs opposed what they in good faith believed to be discriminatory housing conduct, Defendants violated 42 U.S.C. § 3617. Blair is liable for her own alleged participation, and BH and AMZAK are liable to the extent provided by law for actions taken through their personnel and authorized agents in the management and enforcement of Plaintiffs' tenancy.

**ANSWER: Defendants deny the allegations in Paragraph 59.**

60. Plaintiffs suffered the injuries described above as a result of the alleged retaliation.

**ANSWER: Defendants deny the allegations in Paragraph 60.**

## V. JURY DEMAND

61. Plaintiffs demand a trial by jury on all issues so triable.

**ANSWER: Defendants admit that Plaintiffs have demanded a trial by jury on all issues so triable. No further response is required.**

WHEREFORE, Defendants, BH MANAGEMENT SERVICES, LLC, AMZAK WAUKEGAN, LLC, and KATRINA BLAIR, respectfully pray that judgment be entered in their

favor and against Plaintiffs, with costs assessed against Plaintiffs, and that Defendants be awarded any such other relief the Court deems just and proper.

## AFFIRMATIVE DEFENSES

Subject to and without waiver of the denials in their Answer to Plaintiff's Second Amended Complaint at Law, Defendants, BH MANAGEMENT SERVICES, LLC, AMZAK WAUKEGAN, LLC, and KATRINA BLAIR, assert the following affirmative defenses to the cause of action alleged in Plaintiffs' Second Amended Complaint at Law.

### FIRST AFFIRMATIVE DEFENSE
### UNLAWFULLY OBTAINED RECORDINGS

To the extent Plaintiffs rely upon any audio recording of a private conversation obtained surreptitiously and without the consent of all parties to that conversation, such recording was obtained in violation of the Illinois Eavesdropping Act, 720 ILCS 5/14-1 et seq., and is inadmissible pursuant to 720 ILCS 5/14-5. Accordingly, Plaintiffs may not rely upon any such unlawfully obtained recording to establish liability or damages in this action.

### SECOND AFFIRMATIVE DEFENSE
### LEGITIMATE, NON-RETALIATORY REASONS / LACK OF CAUSATION

Defendants' actions concerning Plaintiffs' tenancy were undertaken for legitimate, non-retaliatory reasons, including enforcement of lease requirements, conditions observed during the October 15, 2024 inspection, Plaintiffs' account and payment status, and other ordinary property-management considerations. Plaintiffs' alleged protected activity was not a but-for or proximate cause of any challenged action or claimed injury.

### THIRD AFFIRMATIVE DEFENSE
### FAILURE TO MITIGATE DAMAGES

To the extent Plaintiffs sustained any recoverable damages, which Defendants deny, Plaintiffs failed to exercise reasonable diligence to mitigate or avoid such damages. Any recovery must therefore be reduced to the extent permitted by law.

**FOURTH AFFIRMATIVE DEFENSE**
**LACK OF PROXIMATE CAUSATION / INDEPENDENT CAUSES**

Any injuries or damages allegedly sustained by Plaintiffs were caused, in whole or in part, by acts, omissions, decisions, or circumstances independent of Defendants' alleged conduct, including conduct of third parties and Plaintiffs' own actions or omissions. Defendants are not liable for damages that were not proximately caused by any actionable conduct of Defendants.

**FIFTH AFFIRMATIVE DEFENSE**
**SETOFF AND REDUCTION OF DAMAGES**

Any recovery by Plaintiffs must be reduced by any amounts credited, waived, reimbursed, recovered, avoided, or otherwise compensated, to the extent permitted by applicable law.

**SIXTH AFFIRMATIVE DEFENSE**
**SPECULATIVE OR UNPROVEN DAMAGES**

Plaintiffs may not recover damages that are speculative, remote, unsupported, or not established with reasonable certainty and competent evidence.

**SEVENTH AFFIRMATIVE DEFENSE**
**THIRD-PARTY CONDUCT**

To the extent Plaintiffs' claims or alleged damages are based upon acts or omissions of TNT Recovery Services or any other third party, Defendants are not liable for conduct that they did not direct, authorize, participate in, or otherwise cause.

WHEREFORE, Defendants, BH MANAGEMENT SERVICES, LLC, AMZAK WAUKEGAN, LLC, and KATRINA BLAIR, pray that judgment be entered in their favor in

accordance with their Affirmative Defenses, and that they be awarded attorneys' fees, costs and other relief the Court deems just and proper.

Respectfully submitted,

/s/ *Zachary G. Stillman*
One of the Attorneys for Defendants

Phillip G. Litchfield (6317818)
Zachary G. Stillman (6342749)
**LITCHFIELD CAVO LLP**
303 West Madison, Suite 300
Chicago, IL 60606
(312) 781-6584 (Litchfield)
(312) 781-6672 (Stillman)
LitchfieldP@LitchfieldCavo.com
Stillman@litchfieldcavo.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 6, 2026, the foregoing Answer was served via email to the following parties, as well as electronically filed with the CM/ECF system.

ALFRED HOLT
*Pro Se Plaintiff*
805 Baldwin Ave, Apt 303
Waukegan, Illinois 60085
(224) 518-8376
Albizsmart@gmail.com

MARILIA COUTINHO ESPINOLA
*Pro Se Plaintiff*
805 Baldwin Ave, Apt 303
Waukegan, Illinois 60085
Mariliaholt@gmail.com

/s/ *Zachary G. Stillman*
One of the Attorneys for Defendants